IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHARLES WILLIS ROWLAND,

        **Plaintiff,**

    v.                                  Civil Action 2:16-cv-481
                                        Judge George C. Smith
                                        Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Charles Willis Rowland, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits ("DIB") and supplemental security income ("SSI"). For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

    **A.  Prior Proceedings**

Plaintiff applied for supplemental security income on July 12, 2012, and filed for disability benefits on July 26, 2012. (Doc. 9, Tr. 201–203, 212, PAGEID #: 239–241, 250). In both applications, Plaintiff alleged a disability onset date of November 23, 2008.[1] (*Id.*). His application was denied initially on November 1, 2012 (*Id.* at Tr. 125, PAGEID #: 163), and

---

[1] In a letter to the ALJ dated November 4, 2014, Plaintiff's counsel sought to amend the alleged onset date to March 15, 2012. (Doc. 9, Tr. 247, PAGEID #: 285). However, the ALJ's opinion on December 8, 2014, notes an alleged onset date of November 23, 2008. (*See id.* at Tr. 12, PAGEID #: 50). For purposes of this review, the Court will assume the alleged onset date is November 23, 2008.

1

upon reconsideration on February 4, 2013. (*Id.* at Tr. 134, PAGEID #: 172). Administrative Law Judge Edmund Round (the "ALJ") held a hearing by video teleconference on November 10, 2014 (*id.* at Tr. 31, PAGEID #: 69), after which he denied benefits in a written decision on December 8, 2014 (*id.* at Tr. 9, PAGEID #: 47). That decision became final when the Appeals Council denied review on March 24, 2016. (*Id.* at Tr. 1, PAGEID #: 39).

Plaintiff filed this case on March 31, 2016 (Doc. 1), and the Commissioner filed the administrative record on August 5, 2016 (Doc. 9). Plaintiff filed a Statement of Specific Errors on October 6, 2016 (Doc. 13), the Commissioner responded on November 25, 2016 (Doc. 14), and Plaintiff replied on December 5, 2016 (Doc. 15).

### B. Testimony at the Administrative Hearings

At the time of the hearing, Plaintiff was fifty-two years old with a ninth grade education. (Doc. 9, Tr. 36–37, 74–75). During the administrative hearing, Plaintiff testified about his former work framing houses, finishing concrete slabs, and working at a steel company. (*Id.* at Tr. 37–39, PAGEID #: 75–77). Plaintiff described his biggest impediment to his ability to work was "getting along with people" (*id.* at Tr. 43, PAGEID #: 81), but indicated he had not sought mental health counseling or treatment (*id.* at Tr. 44, PAGEID #: 82).

When asked to describe the physical impairments that interfere with his ability to work, Plaintiff stated he has "a lot of pain in [his] back" that he would rate as a constant five or six, but a ten on a pain scale from one to ten when it's at its worst. (*Id.* at Tr. 45–46, PAGEID #: 83–84). Plaintiff indicated he is not currently taking any medication for the pain, but stated he had taken oxycodone and OxyContin in the past. (*Id.* at Tr. 47–48, PAGEID #: 85–86). Plaintiff also said he has sharp pain in his knee almost daily (*id.* at Tr. 51, PAGEID #: 89) and that he has pain in

2

his left shoulder "about every day" (*id.* at Tr. 52, PAGEID #: 90). Further, Plaintiff explained that he is blind in his left eye and that it "just sort of came on." (*Id.* at Tr. 53, PAGEID #: 91). Plaintiff explained that even with glasses "the only thing [he] can see out of [the left eye] is blurry. It's like real foggy." (*Id.* at Tr. 53–54, PAGEID #: 91–92). However, Plaintiff stated he successfully renewed his driver's license, despite the vision issues he alleged. (*Id.* at Tr. 54, PAGEID #: 92).

In terms of daily activities, Plaintiff stated he drinks coffee in the morning, drives over to a horse barn and racetrack owned by friends, cooks, and feeds his cat. (*Id.* at Tr. 55–57, PAGEID #: 93–95).

### C. Relevant Medical Background

Although unrelated to the impairments at issue, two hospital visits in the year of the alleged onset date are worth noting. First, Plaintiff was treated at the Knox Community Hospital Emergency Room ("ER") on January 6, 2008, complaining of tooth pain. (Doc. 9, Tr. 303, PAGEID #: 341). Plaintiff requested a prescription for hydrocodone but was given Amoxil and Vicodin instead. (*Id.* at Tr. 303–04, PAGEID #: 341–42). A few months later, Plaintiff was seen at the same ER after being struck in the head with a floor joist. (*Id.* at Tr. 293, PAGEID #: 331). Upon the doctor prescribing him Ultram, Plaintiff argued that he wanted something stronger and that the prescribed medication was "worthless." (*Id.* at Tr. 296–97, PAGEID #: 334–35). After the doctor explained to Plaintiff that because of his head injury, he did not want him to take anything stronger, Plaintiff signed his discharge, yelling expletives as he left. (*Id.*).

On June 20, 2008, Plaintiff had a CT scan of his lumbrosacral spine. (*Id.* at Tr. 250, PAGEID #: 288). The scan revealed normal alignment and curvature of the spine with no

3

fractures or dislocations. (*Id.*). There was mild concentric disc bulging at the L3-L4 level with minimal impingement on the exiting L4 nerve root. (*Id.*). Additionally, there were minimal degenerate changes of the facet joints and the L5-S1 level showed mild facet arthrosis. (*Id.*).

Plaintiff presented to the Knox Community Hospital ER on December 15, 2011, after twisting his right knee several days prior. (*Id.* at Tr. 281, PAGEID #: 319). A physical exam revealed that Plaintiff was weight-bearing, had no swelling, and exhibited full range of motion. (*Id.* at Tr. 281, PAGEID #: 319). An MRI taken the same day of his knee and ankle revealed no abnormal findings, and showed no fractures, dislocations or evidence of bone or joint disease. (*Id.* at Tr. 279, PAGEID #: 317). Plaintiff was discharged and given prescriptions for Vicodin and Motrin. (*Id.* at Tr. 285, PAGEID #: 323).

Plaintiff returned to the ER on February 23, 2012, complaining of back pain that was made worse after "mucking out [horse] stalls last night." (*Id.* at Tr. 267, 274, PAGEID #: 305, 312). Plaintiff reported taking Motrin and oxycodone in the past to control pain and discomfort. (*Id.* at Tr. 277, PAGEID #: 315). After examination, Plaintiff was diagnosed with an acute lumbrosacral strain, his condition was noted as "good," and he was sent home with prescriptions for Vicodin, Amoxil, Motrin, and Flexeril. (*Id.* at Tr. 269, 272, PAGEID #: 307, 310).

On April 27, 2012, Plaintiff went to the ER yet again, complaining of low back pain after shoveling horse stalls. (*Id.* at Tr. 255, PAGEID #: 293). Plaintiff was diagnosed with a lumbar strain and muscle spasms (*id.*), and was proscribed Vicodin, Flexeril, and Naprosyn. (*Id.* at Tr. 260, PAGEID #: 298). His medical records made several references to the fact that this was an "acute" injury, as opposed to chronic. (*Id.* at Tr. 265, PAGEID #: 303).

Plaintiff saw Dr. Sushil M. Sethi for his shoulder, back, and knee pain on August 15,

4

2012. (*Id.* at Tr. 350, PAGEID #: 388).  At the appointment, Plaintiff reported having taken no medication at all for three years, although he admitted that he used to take OxyContin, Percocet and Soma. (*Id.*).  The physical examination revealed that Plaintiff's left knee had no effusion or laxity of ligaments, and that Plaintiff walked with a normal gait, was able to walk on tiptoes and heels, and could squat. (*Id.* at Tr. 351, PAGEID #: 389).  Both shoulders showed mild tenderness in the AC joint with bony crepitus at +1. (*Id.* at Tr. 351–52, PAGEID #: 389–90).  The cervical spine showed mild tenderness at the C6-7 level but there was no swelling, redness or deformity and no curvature abnormality. (*Id.* at Tr. 352, PAGEID #: 390).  It was also noted that Plaintiff's right eye was 20/20 and his left eye was 20/200, yet he arrived at the examination with no glasses. (*Id.* at Tr. 351, PAGEID #: 389).  Overall, Dr. Sethi opined that there were minimal arthritic findings and no neuromuscular deficits. (*Id.* at Tr. 352, PAGEID #: 390).  In terms of work limitations, Dr. Sethi stated Plaintiff could sit 4–6 hours, stand 3–4 hours, and walk 3–4 hours in an 8-hour shift, as well as lift and carry 20-25 pounds frequently. (*Id.*).

On September 18, 2012, Plaintiff saw Dr. Steven Meyer for a psychological evaluation to assess his mental status. (*Id.* at Tr. 358, PAGEID #: 396).  When asked about the nature of his disability, Plaintiff replied that "he has back problems, has been in prison four times, and cannot keep work and needs to go to a doctor." (*Id.*).  Plaintiff "denied having any problems getting along with coworkers or supervisors in the past." (*Id.* at Tr. 363, PAGEID #: 401).  In terms of daily activities, Plaintiff stated he drinks coffee, watches the news, eats breakfast, goes out to search for aluminum cans, his sister stops by, he works in his garden, watches television, and talks to neighbors. (*Id.* at Tr. 359, PAGEID #: 397).

Plaintiff was alert during the evaluation, but presented as confused at times and

5

evidenced mild comprehension problems.  (*Id.*).  Plaintiff reported that he had never been hospitalized for psychiatric reasons, has never been involved in outpatient counseling, and has never had psychological testing performed.  (*Id.* at Tr. 360, PAGEID #: 398).  During testing, Plaintiff was cooperative for the most part, although attention and concentration were disrupted and Plaintiff was distracted.  (*Id.* at Tr. 361, PAGEID #: 399).  It was noted that Plaintiff had "no difficulty with his vision."  (*Id.*).  Plaintiff obtained a Full Scale IQ score of 55 during the evaluation, which falls in the Extremely Low range of functioning, although Dr. Meyer noted that the score appeared to be "a low estimate of his abilities."  (*Id.* at Tr. 361–62, PAGEID #: 400–01).  Ultimately, Dr. Meyer diagnosed Plaintiff with Depressive Disorder NOS, PTSD, Personality Disorder NOS, Learning Disorder NOS, and Borderline Intellectual Functioning.  (*Id.* at Tr. 362, PAGEID #: 400).

     Plaintiff visited the Knox Community Hospital ER again on January 8, 2016, after falling on ice and twisting his left knee.  (*Id.* at Tr. 365, PAGEID #: 403).  The ER records show that Plaintiff had no deformity, no swelling or effusion, and full range of motion, albeit with pain.  (*Id.*).  Plaintiff's x-rays were normal and he was diagnosed with a knee sprain/strain, and told to follow up with Dr. Gregory Cush.  (*Id.* at Tr. 370–71, 380, PAGEID #: 408–09, 418).

     Plaintiff slipped on ice again on February 1, 2013, and returned to the ER claiming he had re-injured his left knee.  (*Id.* at Tr. 381, PAGEID #: 419).  Upon evaluation, Plaintiff had a normal gait and normal range of motion.  (*Id.* at Tr. 383, PAGEID #: 421).  Plaintiff's neurologic evaluation revealed he was alert and oriented with no impairment of recent memory, normal sensation, and normal coordination.  (*Id.*).  Plaintiff was discharged and told to follow-up with Dr. Cush as soon as possible.  (*Id.*).

Plaintiff followed up with Dr. Cush regarding his left knee pain on February 12, 2013. (*Id.* at Tr. 429, PAGEID #: 467). The onset of knee pain was described as acute, and upon evaluation the knee there were no signs of swelling or effusion. (*Id.*). Dr. Cush ordered an MRI, which revealed normal findings with "no meniscal nor ligamentous pathology." (*Id.* at Tr. 430–31, PAGEID #: 468–69). Plaintiff was told to ice, elevate, and take ibuprofen for his pain. (*Id.* at Tr. 432, PAGEID #: 470).

Also in February 2013, Plaintiff saw Dr. Craig Cairns for pain in his low back, left knee, left shoulder, and right ankle. (*Id.* at Tr. 385–86, PAGEID #: 423–24). It was noted that Plaintiff had decreased visual acuity in his left eye and was scheduled to see an ophthalmologist for consideration of cataract extraction. (*Id.* at Tr. 386, PAGEID #: 424). Plaintiff admitted to being mildly depressed, "however this has not been severe and he denie[d] any suicidal thoughts or intent." (*Id.*). Dr. Cairns stated that the auditory hallucinations Plaintiff described were troublesome, but "his mental status seem[ed] normal otherwise." (*Id.*). Overall, Dr. Cairns described Plaintiff's functional abilities regarding "work at this time" to be limited with respect to bending at the waist, standing, walking, lifting, and using his left arm, although it was noted these limitations were temporary, expected to last only between 30 days and 9 months. (*Id.* at Tr. 387, 392 PAGEID #: 425, 430).

Plaintiff saw Dr. Ripal Parikh on April 15, 2013, for treatment options related to his lower back pain. (*Id.* at Tr. 441, PAGEID #: 479). Dr. Parikh believed Plaintiff had chronic back pain from a combination of lumbar disk herniation and potentially radiculitis, spondylosis, and spasms. (*Id.* at Tr. 442, PAGEID #: 480). Dr. Parikh's plan was to get an x-ray of Plaintiff's lumbar spine, prescribe oxycodone for the pain following a urine drug screen, and start him in

7

physical therapy. (*Id.*). The x-ray of the lumbar spine showed only mild facet arthropathy at L4-L5 and L5-S1 with no significant disc space narrowing, no spoylolysis or spondylolisthesis. (*Id.* at Tr. 426, PAGEID #: 464). Overall, it was noted that the imaging revealed minimal degenerative changes. (*Id.*). The urine drug screen revealed the presence of non-prescribed oxycodone and benzodiazepine. (*Id.* at Tr. 433, 440 PAGEID #: 471, 478). According to Dr. Parikh, Plaintiff stated he was prescribed oxycodone four to five years ago, and "even tried to explain that he had one saved up from years ago, which he did not admit to prior." (*Id.* at Tr. 440, PAGEID #: 471). As a result of the "inappropriate urine drug screen, showing 2 medications that were not prescribed to him recently and he did not admit to," Dr. Parikh opined that he did "not feel that [Plaintiff] is a good candidate for opioid medications." (*Id.*). Dr. Parikh offered other treatment options, such as injections, but Plaintiff turned him down. (*Id.*).

Plaintiff did start physical therapy on April 17, 2013, as Dr. Parikh recommended, for his back pain as well as reported numbness and tingling in bilateral extremities. (*Id.* at Tr. 419, PAGEID #: 457). However, Plaintiff attended only five physical therapy sessions, during which it was noted on several occasions that it was questionable whether Plaintiff was completing his recommended exercises and stretches at home. (*Id.* at Tr. 396, 399, 401, PAGEID #: 434, 437, 439). Plaintiff's treatment notes reflected that he "apparently self-discharged" himself on May 10, 2013, because he stopped contacting the clinic. (*Id.* at Tr. 394, PAGEID #: 432).

### D. State Agency Assessments

State Agency psychologist Dr. Arcelis Rivera opined on October 26, 2012, that Plaintiff's restriction of activities of daily living was mild, his difficulty in maintaining social functioning was moderate, his difficulty maintaining concentration, persistence, or pace was moderate, but

8

there were no episodes of decompensation. (*Id.* at Tr. 78, PAGEID #: 116). Overall, Dr. Rivera found Plaintiff did not meet criteria C of the Listings. (*Id.*). On January 29, 2013, Dr. Roseann Umana noted similar concentration, understanding, and memory limitations and opined that Plaintiff needed a work environment that is static, but found Plaintiff was not disabled. (*Id.* at Tr. 110, PAGEID #: 148).

On October 28, 2012, Dr. Leanne Bertani found Plaintiff to be only partially credible based on the fact that his complaints of pain were inconsistent with his activities of daily living and medical records showing he has "good movement and strength throughout his body." (*Id.* at Tr. 79, PAGEID #: 117). Dr. Bertani noted some minor postural and manipulative limitations but ultimately found Plaintiff was not disabled. (*Id.* at Tr. 81–84, PAGEID #: 119–22). On January 29, 2013, Dr. Gary Hinzman reached a similar conclusion in terms of limitations and similarly found Plaintiff was not disabled. (*Id.* at Tr. 108, PAGEID #: 146).

### E. The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since November 23, 2008, the alleged onset date. (*Id.* at Tr. 14, PAGEID #: 52). Moving to step two, the ALJ found that Plaintiff suffered from one severe impairment—borderline intellectual functioning—because it "ha[d] caused the claimant more than minimal limitations in the ability to engage in basic work-related activities for at least a continuous twelve-month period[.]" (*Id.*). The ALJ also addressed Plaintiff's non-severe impairments, which included back pain from "minimal" degenerative changes and "mild" disc bulging and knee pain associated with "mild" osteoarthritis. (*Id.* at Tr. 15, PAGEID #: 53). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed

9

impairment. (*Id.* at Tr. 17, PAGEID #: 55).

According to the ALJ, after considering Plaintiff's severe mental impairment, it did not meet the level of severity required by the Listing of Impairments. (*Id.*). Specifically, the ALJ stated that:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of one of the Listed Impairments at 20 CFR Part 404 Appendix 1. Specifically, the claimant's mental impairment has been considered under the requirements of listing 12.05 for intellectual disability. Intellectual disability refers to significantly subaverage general intellectual functions with deficits in adaptive function initially manifested during the development period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in paragraphs A, B, C, or D are satisfied.

(*Id.*). The ALJ then analyzed each paragraph in detail, ultimately finding that Plaintiff's condition did not meet the requirements. (*Id.* at Tr. 18–19, PAGEID #: 56–57).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

> [Plaintiff] has no exertional limitations. He is limited to simple, routine, low-stress tasks. This means that he is precluded from tasks that involve fast-paced production environments, and from tasks that required arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

(*Id.* at Tr. 19, PAGEID #: 57). The ALJ also found Plaintiff's "allegations related to his inability to work [were] overstated and unsupported by the record as a whole." (*Id.* at Tr. 21, PAGEID #: 59). Specifically, "the medical evidence does not establish pain or limitation of the level and severity that would result in debilitation limitations." (*Id.*).

Relying on these and other considerations, the ALJ ultimately concluded that Plaintiff was capable of performing past relevant work as a concrete laborer. (*Id.* at Tr. 22, PAGEID #: 60). The ALJ also made the alternative finding that there are other jobs existing in the national

economy that Plaintiff is able to perform. (*Id.* at Tr. 23, PAGEID #: 61).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

In his Statement of Specific Errors, Plaintiff argues that the ALJ's evaluation of his physical and mental impairments were not supported by substantial evidence. (Doc. 13 at 5, 7). In particular, Plaintiff believes the ALJ did not perform the proper analysis in evaluating Plaintiff's "back and knee impairments, his left eye blindness, his shoulder impairments, and his coexisting psychological diagnoses" at step two, or elsewhere in the decision. (*Id.* at 4).

### A. Physical Impairments Evaluation

Plaintiff alleges the ALJ's failure to mention his shoulder problems and left eye blindness, despite the record containing information regarding these impairments, shows that the

ALJ's final decision was not supported by substantial evidence. (*Id.* at 5–6). Further, Plaintiff argues that the ALJ's determination that his back and knee problems are non-severe is also "unsupported by substantial evidence." (*Id*. at 6).

1. *Shoulder Problems*

In his Disability Report dated July 27, 2012, Plaintiff was asked to "[l]ist all of the physical or mental conditions (including emotional or learning problems) that limit your ability to work." (Doc. 9, Tr. 216, PAGEID #: 254). Plaintiff answered that he was unable to work due to knee and back injuries. (*Id.*). In his "Disability Report – Appeals," dated December 12, 2012, Plaintiff indicated that he had developed new physical and mental limitations—eye problems and bipolar disorder. (*Id.* at Tr. 27, PAGEID #: 265). Notably absent from Plaintiff's disability reports were any allegation that he had any shoulder impairment. Accordingly, the ALJ's failure to analyze Plaintiff's alleged shoulder injury does not constitute reversible error. *Charrette v. Comm'r of Soc. Sec.*, No. CV 15-10930, 2016 WL 7985332, at *7 (E.D. Mich. Aug. 4, 2016), *report and recommendation adopted*, No. 15-CV-10930, 2016 WL 4561333 (E.D. Mich. Sept. 1, 2016) (holding that the ALJ did not commit reversible error in failing to evaluate several impairments alleged by Plaintiff that were not alleged in her disability report because "there is no need to impose limitations based on a condition that . . . was not even alleged by the claimant to be severe in the first instance") (citing *Smith v. Colvin*, No. 13-12700, 2014 U.S. Dist. LEXIS 58243, at *19 (E.D. Mich. Mar. 18, 2014)); *see also Sebastian v. Comm'r of Soc. Sec.*, No. 1:13-CV-792, 2014 WL 5040574, at *5 (W.D. Mich. Sept. 24, 2014) (holding that the ALJ's failure to address plaintiff's obesity was not an error and "understandable because plaintiff did not claim obesity as an impairment in her original disability report or her disability report on appeal.").

12

2. *Eye Problems*

Plaintiff also argues that the ALJ's analysis is inadequate because it does not discuss Plaintiff's left-eye blindness. (Doc. 13 at 5). "There is no requirement, however, that [] the ALJ . . . must discuss every piece of evidence in the administrative record." *Hamper v. Comm'r of Soc. Sec.*, 714 F. Supp. 2d 693, 703 (E.D. Mich. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x. 496, 508 (6th Cir. 2006)). In fact, while an ALJ is required to consider all of the relevant evidence in the record, there is no requirement that the ALJ expressly discuss each piece of that evidence. *Thurman v. Comm'r of Soc. Sec.*, No. 1:12-CV-2034, 2013 WL 2358579, at *7 (N.D. Ohio May 29, 2013) (quoting *Smith v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 39785, 8–9, 2010 WL 1640271 (E.D.Va. Apr. 22, 2010); *see also Kornecky*, 167 F. App'x. at 508 ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

Here, the only references in the record to eye issues are Plaintiff's testimony at the administrative hearing, Dr. Sethi's one line note that Plaintiff's left eye was 20/200 without glasses (*id.* at Tr. 351, PAGEID #: 389), and Dr. Cairns' short note that Plaintiff had decreased visual acuity in his left eye and was scheduled to see an ophthalmologist for consideration of cataract extraction (*id.* at Tr. 386, PAGEID #: 424). Under 20. C.R.F. § 416.981, an individual is considered blind if there "is central visual acuity of 20/200 or less . . . with the use of a correcting lens." Here, Plaintiff has presented no evidence that his left eye has a visual acuity of 20/200 with correcting lenses. Thus, it is reasonable to assume that the ALJ considered the evidence without directly addressing it in his written opinion because Plaintiff had not provided evidence that he was blind or otherwise visually disabled. *See* 20 C.F.R. 416.912 ("In general,

13

you have to prove to us that you are blind or disabled."); *see also Owings v. Colvin*, 133 F. Supp. 3d 959, 1000 (M.D. Tenn. 2015 (holding that because "plaintiff was represented by counsel in the proceedings below, it was his responsibility to provide the results of a vision test to support this claim"). Accordingly, the undersigned finds that "[n]o purpose would be served by remanding for the ALJ to explicitly address the shortcomings" of Plaintiff's evidence in regards to his alleged eye impairment. *Kornecky*, 167 F. App'x at 508 (citing *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) (citation omitted) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").

### 3. *Knee and Back Problems*

The ALJ found that there was no evidence that the symptoms associated with Plaintiff's back and knee impairments persisted for a twelve month period, as required by 20 C.F.R. § Pt. 404, Subpt. P, App. 1. (Doc. 9, Tr. 16, PAGEID #: 54). In the alternative, the ALJ held that even if the evidence established that Plaintiff's physical impairment symptoms satisfied the durational criteria, "the objective findings contain no more than 'mild' abnormalities at best," and thus were classified as non-severe. (*Id.*). Ultimately, the ALJ concluded that "the objective evidence fail[ed] to support the claimant's allegations of debilitating pain" and found "the evidence fail[ed] to prove that claimant's knee and back pain placed more than a minimal limitation on his ability to perform basic work activities[.]" (*Id.* at Tr. 16, PAGEID #: 54).

Even if the Court assumes, *arguendo*, that the durational requirements were met, the ALJ's conclusion that Plaintiff's back and knee impairments were mild, and thus non-severe, is supported by substantial evidence. Plaintiff claims the ALJ "substitut[ed] [] his medical

14

judgment for that of the two consulting physicians and two reviewing physicians" who opined on the limiting effects of Plaintiff's impairments. (Doc. 13 at 7). However, the ALJ considered and properly evaluated all four medical opinions.

First, the State Agency medical consultants opined that Plaintiff would be limited to work at the medium exertional level with additional non-exertional limitations. (Doc. 9, Tr. 80–83, 107–110, PAGEID #: 118–21, 145–48). The consultants also indicated, however, that Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by objective medical evidence alone, and they found Plaintiff to be only partially credible based on his activities of daily living and movement and strength. (*Id.* at Tr. 79, 106, PAGEID #: 117, 144). The ALJ gave some weight to those opinions, to the extent that they recognized that Plaintiff's physical impairments are not as limiting as alleged. (*Id.* at Tr. 16, PAGEID #: 54). This decision is supported by the rest of Plaintiff's medical record, which contains very little objective, physical, or clinical evidence of disabling severity. The ALJ was entitled, under these circumstances, to consider Plaintiff's credibility, and substantial evidence supports the ALJ's adverse credibility finding. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Indeed, the record supports that Plaintiff's physical impairments are not as limiting as he alleges. As the ALJ observed, imaging studies performed on Plaintiff after his alleged onset date revealed fairly normal results or minimal or mild issues. (*Id.*) A CT scan of Plaintiff's back in June 2008 revealed only minimal degenerative changes, an x-ray on Plaintiff's knee in December 2011 was normal, and another x-ray of Plaintiff's knee in 2013 was once again normal. (*Id.*). Additionally, Plaintiff frequently exhibited normal range of motion, normal gait, and normal

15

sensation. (*Id.*; *see also id.* at Tr. 351, 383, PAGEID #: 389, 421). Moreover, the ALJ found further support that Plaintiff's impairments were non-severe in his "questionable" compliance with physical therapy and decision to discharge himself from the program. (*Id.* at Tr. 16, PAGEID #: 54). *See Zanders v. Comm'r of Soc. Sec.*, No. 1:13-cv-137, 2014 WL 272165, at *6 (S.D. Ohio Jan. 23, 2014); *Simpson v. Comm'r of Soc. Sec.*, No. 1:14-cv-801, 2016 WL 74420, at *11 (S.D. Ohio Jan. 6, 2016) (holding that because "[t]he record does not show that plaintiff followed through on her treating orthopedist's suggestions despite her complaints of disabling pain" the ALJ was reasonable in discounting Plaintiff's complaints). Finally, the fact that Plaintiff was not interested in pursuing alternative treatment methods after Dr. Parikh decided against prescribing opioids weighs in favor of his impairment being non-severe. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain."). Accordingly, the medical record supports the ALJ's decision to give weight to the agency consultants' opinions only to the extent that they opined Plaintiff's limitations were not as severe as he alleged.

As to the examining physicians, the ALJ gave some weight to both Dr. Cairns' and Dr. Sethi's opined limitations. (Doc. 9, Tr. 17, PAGEID #: 55). The ALJ properly explained that only some weight was given to both doctors' findings because they were a reflection of acute injuries, rather than a chronic impairment. (*Id.*). The ALJ's conclusion is supported by hospital records showing Plaintiff continuously sought treatment for acute injures, such as falling on ice or shoveling horse stalls, rather than chronic injuries. (*Id.*). Additionally, Plaintiff was

16

diagnosed in February 2012 with an acute lumbrosacral strain (*id.* at Tr. 269, PAGEID #: 307), and it was noted several times during his April 2012 ER visit that he was seeking treatment for an "acute" injury, as opposed to a chronic one (*id.* at Tr. 265, PAGEID #: 303). Further, Dr. Cairns himself indicated that Plaintiff's functional limitations were expected to last for only thirty days to nine months. Accordingly, the ALJ's determination did not ignore the physicians' opinions—instead it granted some weight based on the circumstances surrounding the evaluation. Thus, the ALJ's finding that Plaintiff's knee and back impairments were not severe is supported by substantial evidence.

### B. Mental Impairments Evaluation

Plaintiff additionally argues that the ALJ improperly "provided his own diagnosis of [his] psychological impairments and rejected the diagnoses of the psychological examiner chosen by the Social Security Administration, as well as the conclusions of the psychologists who had reviewed those diagnoses." (Doc. 13 at 8). Consequently, Plaintiff argues that the ALJ erred by failing to consider additional mental impairments beyond borderline intellectual functioning, such as depressive disorder, post-traumatic stress disorder, a learning disorder, and a personality disorder that were diagnosed by Dr. Meyer. (*Id.* at 7–9). Because the ALJ improperly considered these other impairments, Plaintiff argues, the ALJ's final decision was not supported by substantial evidence. (*Id.* at 9).

The ALJ specifically acknowledged that in addition to borderline intellectual functioning, Dr. Meyer also diagnosed Plaintiff with a depressive disorder, posttraumatic stress disorder (PTSD), and a personality disorder. (Doc. 9, Tr. 20, PAGEID #: 58). Dr. Meyer opined that because of Plaintiff's depression and PTSD/anxiety symptoms, he would be "able to perform

17

only in a lower stress work setting, and with assistance as needed at times of change in routine." (*Id.* at Tr. 363, PAGEID: 401).  The ALJ gave no weight to these diagnoses "because they [we]re based on the claimant's behavior and allegations during this one-time examination, and [we]re unsupported by the record as a whole."  (*Id.* at Tr. 20, PAGEID #: 58).  Specifically, the ALJ noted that Plaintiff's medical record provided no other evidence of these mental impairments. (*Id.* at Tr. 21, PAGEID #: 59).

For example, Plaintiff had never been hospitalized for psychiatric reasons, nor had he ever been involved in counseling.  (*Id.* at Tr. 360, PAGEID #: 398).  While failure to seek or engage in mental health treatment does not necessarily "evidence a tranquil mental state . . . [a] reasonable mind might find that the lack of treatment could indicate an alleviation of symptoms." *Cole v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 738, 743 (E.D. Mich. 2015) (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir.2009)) (internal quotation marks omitted); *see also Esch v. Comm'r of Soc. Sec.*, No. 1:09-CV-144, 2010 WL 432265, at *5 (W.D. Mich. Jan. 25, 2010) (stating the "general rule that a claimant's failure to seek treatment over an extended time period undercuts the claimant's assertion that his impairment is disabling").

Additionally, the records from one of Plaintiff's numerous ER visits for a left-knee injury in February 2013 stated "Not Present – Depression and Mood changes."  (*Id.* at Tr. 382, PAGEID #: 420).  Also, during an examination, Dr. Cairns opined that Plaintiff's mental status exam seemed normal, besides his own complaints of auditory hallucinations.  (*Id.* at Tr. 387, PAGEID #: 425).  Plaintiff attempts to undermine these opinions by arguing that the physicians were evaluating his physical condition only, rather than his mental health.  (Doc. 13 at 8). However, the fact that these doctors did not specialize in mental health did not preclude them

18

from evaluating Plaintiff's mental health condition. *See Wert v. Comm'r of Soc. Sec.*, 166 F. Supp. 3d 935, 946 (S.D. Ohio 2016) (holding that a doctor's "lack of mental-health specialization does not disqualify him from opining as to Plaintiff's mental status") (citing *Mason v. Comm'r of Soc. Sec.*, No. 1:07–cv–51, 2008 WL 1733181, at *14 n. 5 (S.D. Ohio Apr. 14, 2008)).

Finally, Plaintiff's own admissions support the ALJ's conclusion. When Plaintiff saw Dr. Parikh, Plaintiff completed a health questionnaire and answered "no" to whether he had a "mental health condition." (*Id.* at Tr. 427, PAGEID #: 465). Additionally, during an evaluation with Dr. Cairns, Plaintiff stated he believed he was mildly depressed but admitted it had not been severe. (*Id.* at Tr. 386, PAGEID #: 324). The ALJ properly considered these admissions in evaluating Plaintiff's mental health. *See Sanders v. Comm'r of Soc. Sec.*, No. 1:15-CV-01268, 2017 WL 710257, at *6 (W.D. Mich. Feb. 23, 2017) (holding that the ALJ's conclusion was supported by substantial evidence, in part based on "Plaintiff's own admissions"); *Bell v. Barnhart*, 148 F. App'x 277, 284 (6th Cir. 2005) (holding that "[t]he ALJ was entitled to consider [Plaintiff's] own admission" regarding his abilities).

Accordingly, the ALJ properly evaluated Plaintiff's alleged psychological impairments, and substantial evidence supported his conclusion that these impairments were not severe.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 13) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen

(14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

    IT IS SO ORDERED.

Date: March 31, 2017                                    /s/ Kimberly A. Jolson
                                                                      KIMBERLY A. JOLSON
                                                                      UNITED STATES MAGISTRATE JUDGE